NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMES GATLEY,

                Plaintiff,

-vs-                                  Case No.  6:10-cv-423-ORL-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____

# ORDER

This cause came on for consideration without oral argument on the Complaint filed by James Gatley, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 5, 6.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 8, 9.

## I.    PROCEDURAL  HISTORY.

In May 2007, Gatley applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as the Act).  R. 95-102. He alleged that he became disabled on April 15, 2007. R. 95.  Gatley's application was denied initially and on reconsideration.  R. 47-54, 63-64.

NOT FOR PUBLICATION

Gatley requested a hearing before an administrative law judge (ALJ).  R. 62.  An ALJ held a hearing on August 19, 2009. Gatley, represented by an attorney, testified at the hearing.  Robert Bradley, a vocational expert (VE), also testified.  R. 19-37.

After considering the testimony and the medical evidence presented, the ALJ determined that Gatley was insured under OASDI through December 13, 2012.  R. 13. The ALJ found that Gatley had not engaged in substantial gainful activity since the alleged onset date of his disability. *Id.*

The ALJ concluded that the medical evidence showed that Gatley had carpal tunnel syndrome and degenerative disc disease, which were severe impairments. *Id.*  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).  R. 13-15.  The ALJ found that Gatley had an adjustment disorder with depression, which was not a severe impairment.  This condition caused only mild limitation in activities of daily living, social functioning and concentration, persistence and pace with no episodes of decompensation.  R. 13-14.

The ALJ found that Gatley had the residual functional capacity (RFC) to perform a range of light work[1] with a sit/stand option.  R. 15.  In reaching this conclusion, the ALJ gave little weight to the functional capacity assessment prepared by Jeffrey Newfield, D.O., one of Gatley's treating orthopedists, finding that Dr. Newfield appeared to "uncritically accept

---

[1] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567.

as true most, if not all, of what the claimant reported," and because the functional capacity assessment was sought as evidence in support of a worker compensation claim. R. 16. The ALJ also found Gatley' testimony about the limitations arising from his impairments was not entirely credible. *Id.* He gave great weight to the opinions of the reviewing physicians. *Id.* He did not mention the functional capacity assessment made by Sangetta Duggal, M.D., or the disability rating assigned to Gatley by the Veterans Administration (VA).

Relying on the testimony of the VE and other evidence in the record, the ALJ concluded that there were jobs available in the national economy that Gatley could perform. R. 18. Therefore, the ALJ concluded that Gatley was not disabled. *Id.*

Gatley requested review of the ALJ's decision. R. 6. On January 26, 2010, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 1-2. Gatley timely sought review of this decision by this Court. Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

NOT FOR PUBLICATION

laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity

to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing

*Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## IV.    STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are adequately set forth in the ALJ's decision and the parties' memoranda. Therefore, I will only summarize the relevant facts to protect Gatley's privacy to the extent possible.

Gatley was born in 1959. R. 95. He received a high school diploma. R. 22. His past relevant work was with the Postal Service. R. 22. While performing that job, he had back spasms and his leg would give out. Increased medication caused him to be sleepy and lose concentration. R. 24. Ultimately, he was released from the job on disability retirement. R. 24.

Gatley treated at a VA facility. R. 221. He complained of low back pain since 1986. R. 194, 198-207. On January 29, 2003, the VA determined that Gatley's chronic low back pain syndrome resulting in severe limitation of motion of the lumbar spine was 40% disabling as of September 11, 2002. R. 123-24.

Gatley began treatment by Drs. Aron and Jeffrey Newfield, orthopedists, in 2003, initially to help the Postal Service assess Gatley's work restrictions. *See, e.g.,* R. 292. At the initial visit, Gatley indicated that when he bent to hook up a container to a motor, he felt a sharp pain in his low back and right thigh. Since that time, he had had pain. R. 510. Upon examination, Dr. Newfield noted restriction in cervical range of motion, discomfort over the dorsal spine, palpable muscle spasm and tenderness on palpation in the lumbar and

sacroiliac areas.  R. 513.  An earlier x-ray showed no lumbar spine injury.  The assessment was lumbo/sacral sprain/strain superimposed on a reportedly disabled low back (40%).  R. 514.  He allowed Gatley to return to light work.  R. 514.  He was to avoid excessive bending, lifting and twisting.  R. 515; *see also* R. 495.  An MRI taken in April 2003 revealed small disc protrusion at L5-S1 and mild degenerative disc disease at L3-L4.  R. 507.

On June 16, 2005, Dr. Newfield permitted Gatley to lift 5 to 20 pounds. R. 481. On March 30, 2006, Dr. Newfield noted that Gatley's condition was improving with physical therapy, and he was trying to lose weight by being active at the YMCA without doing anything to aggravate his condition.  R. 294; *accord* R. 292.  Dr. Newfield suggested exercises that would gently strength Gatley's body. R. 291; *see also* 289.   He also fitted Gatley with a lumbosacral corset in June 2006.  R. 280. On June 22, 2006, Dr. Newfield identified what felt "like ropiness of knots within the paraspinal musculature." He had injected areas of the spasms previously with some relief of symptoms.  R. 468.  Dr. Newfield regularly provided assessments of Gatley's condition to the Postal Service for worker's compensation purposes. R. 290, 292.

On December 22, 2006, Gatley stated that he had burning pain down his right leg. R. 209.  He had a course of physical therapy. R. 194-95.  A TENS unit and codeine as necessary for pain was also prescribed.  R. 196.

In February 2007, Gatley told Dr. Newfield that he had to go home from work one day due to increased low back problems.  Dr. Newfield prescribed Lortab.  R. 290. In April 2007, Dr. Newfield indicated that Gatley limited to lifting and carrying 1 to 2 hours a day, and a maximum of 25 pounds.  She could sit 1 hour a day, stand 2 to 4 hours a day, and walk 2 to 3 hours a day. He could not climb.  He could kneel, bend, stoop and twist for a maximum

NOT FOR PUBLICATION

of 1 hour.  He could push, pull and grasp 1 to 2 hours.  He could reach over his shoulders for 1 hour.  R.458.  In May 2007, the VA prescribed an adjustable cane.  R. 329.  On June 21, 2007, Gatley complained of discomfort in the lower back and sacroiliac region.  R. 279.  In July 2007, Gatley indicated that his leg was giving way, which Dr. Newfield indicated seemed to be a progression of symptoms from his back problem. R. 282.  He also reported worsening of spasms in his lower back.  R. 324.  After trying a number of pain medications, Dr. Newfield found that Oxycodone and Valium (for spasms) were the most effective. R. 284; *see also* R. 278.

On February 26, 2007, William Labonte, D.C., examined Gatley for complaints of pain and discomfort in his hands and writs.  Testing was positive for pain and decreased sensation and a dynamometer demonstrated decrease in grip strength in both hands.  Dr. Labonte diagnosed Gatley with carpal tunnel syndrome.  R. 126; *see also* R. 235-55 (Labonte's treatment notes).

On July 26, 2007, Audrey Goodpasture, M.D., prepared a physical RFC assessment after review of Gatley's records.  She opined that Gatley could lift 20 pounds occasionally and 10 pounds frequently.  He could sit, stand or walk about 6 hours a day.  He should only occasionally engage in postural activities, and should avoid concentrated exposure to hazards. R. 178-85.

In October 2007, an ARNP at the VA noted that Gatley walked with a cane and that his lower back was tender to palpation.  R. 317. Dr. Newfield's treatment notes of October 25, 2007, reflect that Gatley was having discomfort due to spasm and irritation in the lumbar spine muscles, pain radiating into his legs and that he walked with a cane.  R. 361.

On February 21, 2008, Dr. Newfield prepared a medical source statement regarding Gatley's functional limitations.  Dr. Newfield indicated that Gatley could lift 10 pounds occasionally and less than 10 pounds frequently.  He could stand or walk at least two hours a day, and sit less than 6 hours a day.  His ability to push and pull was limited in his upper and lower extremities.  He could never engage in postural activities.  He would miss work once or twice a month.  He had limited ability to reach, handle and finger items, and limited ability to work in temperature extremes or with vibrations and hazards.  R. 557-59.

On February 28, 2008, Gatley told Dr. Newfield that he was have fewer intense episodes of spasm, but they still occurred.  Medication had a sedating effect.  R. 379. Dr. Newfield indicated in a questionnaire that Gatley had 4/5 motor deficits in his upper and lower extremities.  He walked with a cane and had an antalgic gait. He noted that the cane was necessary to prevent falls due to lower extremity weakness.  He opined that Gatley could not squat, or walk on his toes or heels.  R. 381. Range of motion was within normal limits. R. 382.

On March 4, 2008, Donald Morford, M.D., prepared a physical RFC assessment based on review of Gatley's records.  He opined that Gatley could lift 20 pounds occasionally and 10 pounds frequent.  He could stand or walk at least 2 hours and sit at least 6 hours in a work day.  His ability to push and pull was limited in the upper extremities.  He noted that the use of a cane seemed to be elective.  R. 384. Gatley could occasionally engage in postural activities but never climb ladders, ropes and scaffolds.  R. 385. He was limited in reaching.  R. 386.  He should avoid concentrated exposure to vibration and even moderate exposure to hazards.  R. 387.  Dr. Morford observed that Gatley's "symptoms and complaints appear slightly exaggerated when compared to the objective findings" in the

medical records.  R. 388.

In July 2008, Sangeeta Duggal, M.D., examined Gatley and reviewed his medical records.  R. 425-43.  Upon examination, Dr. Duggal determined that Gatley's muscle strength in the lower extremities was 4/5, and he had decreased sensation to light touch from his thigh through his toes on the right and from his knee to his foot on the left.  R. 426. Dr. Duggal's assessment was radiculopathy of both lower extremities and myofascial pain syndrome, which would result in moderate restrictions in doing chores, shopping, exercising and traveling. R. 427. Dr. Duggal observed spasms, tenderness and pain with motion in the spine which was significant enough to be responsible for an abnormal gait.  R. 429, 431. Sensation in the lower extremities was 1 / 2.  R. 430.

On July 31, 2008, Dr. Newfield suggested that Gatley walk in a mall in the morning in an effort to lose weight. R. 449. In September 2008, Gatley reported that his back locked when he bent over to take something in or out of the dishwasher.  R. 451.

In June 2009, Gatley told Dr. Newfield that he was having increasing pain from his back down his legs.  Dr. Newfield discussed other pain management options. R. 619. In July 2009, Gatley told Dr. Newfield that he was having burning and shooting pains extending into both feet.  Dr. Newfield indicated that this was a radicular problem.  R. 617.

Gatley also received mental health treatment.  On July 7, 2005, Lee A. Bridgewater, Ph.D., a VA staff psychologist examined Gatley based on symptoms of depression and anxiety.  Dr. Bridgewater observed that Gatley's mood was euthymic to mildly dysthymic, and his affect was moderately constricted to within normal range.  Dr. Bridgewater diagnosed an adjustment disorder and a current global assessment of functioning (GAF) score of 50. R. 227-28.  His condition was the same when he was examined by Dr. Bridgewater in

NOT FOR PUBLICATION

November 2007.  R. 312.

On August 2, 2007, Michael Zelenka, Ph.D., prepared a psychiatric review technique form based on review of Gatley's records.  Dr. Zelenka found insufficient evidence to support an assessment.  R. 263.

On December 28, 2007, Alan Harris, Ph.D., prepared a psychiatric review technique form based on review of Gatley's records.  He opined that Gatley had an affective disorder resulting in only mild limitations of activities of daily living, social functioning and concentration, persistence and pace.  R. 374.

In 2008, Gatley participated in individual psychotherapy.  *See, e.g.,* R. 392-94, 397, 409-10, 528, 536, 541, 568, 586, 600, 604, 608-09.   On March 13, 2008, Lenore Walker, a clinical psychologist, opined that Gatley had a depressive disorder and adjustment disorder, with a GAF of 46.  R. 397.  On April 21, 2008,  Dr. Walker observed that Gatley's mood was dysthymic due to continuing pain.  He was able, for the first time, to talk at a normal pace without pressure. R. 392.  She assessed his GAF score at 50.  R. 393.  In May 2008, Celia Rodriguez, M.D., examined Gatley.   She noted that his attention and concentration were fair.  R. 550.  She assessed a mood disorder with a GAF score of 50.  R. 552-53.  Her assessment was the same when she examined Gatley again in February 2009 with a GAF score of 49.  R. 591-92.

A mental examination and review of records prepared in July 2008 by Juan Marrero, PA-C, showed that Gatley has a depressive disorder not otherwise specified (NOS) with a GAF score of 52.  R. 442-43.

At the time of the ALJ's hearing, Gatley continued to report back spasms and he complained of neck pain due to arthritis.  R. 24. The back pain flared about once a month,

NOT FOR PUBLICATION

during which time he had to stay in bed.  R. 27.  Due to carpal tunnel syndrome in both hands, his hands would become numb after 30 minutes.  As a result, he could not use a computer keyboard for more than 30 minutes.  R. 25.  He took medication for depression, which made it difficult for him to focus.  R. 25-26.  He also took pain medication, but it did not entirely relieve his back pain.  R. 26.

On a typical day, Gatley would take medication before breakfast, watch television then take a nap when the medication took affect.  After lunch, he would sleep if his sat or lied down, so he tried to keep moving.  R. 28.  He could make a sandwich, but he did not cook other meals.  *Id.*  He estimated that he could sit for 1½ hours before needing to change positions.  R. 29.  He could stand 1½ hours before his feet would become numb and he needed to sit down.  He could walk about ½ mile, taking breaks to sit down periodically.  R. 30-35.  He was restricted to lifting no more than 5 pounds.  He could not twist or turn his torso.  R. 31.  He could not stand up from a kneeling position.  R. 32.  He could drive but not when he had too much medication.  R. 32.

The VE testified that Gatley's job with the Postal Service would not accommodate a sit/stand option.  However, there were other jobs requiring a light level of exertion available in the national economy that would accommodate a sit/stand option, specifically ticket seller, labeler, and merchandise price marker.  R. 33-34.

## V.    ANALYSIS.

Gatley asserts five grounds supporting reversal.  He contends that the ALJ erred by giving little weight to the opinion of Drs. Newfield, treating physicians, and giving great weight to the opinion of Dr. Morford, a reviewing physician who had not seen all of Gatley's medical records.  He submits that the ALJ erred by failing to state the weight given to the opinion of

NOT FOR PUBLICATION

Dr. Duggal, an examining physician, and by failing to consider the VA disability determination. He further contends that the ALJ should have considered the limiting effects of depression and the need for an assistive device in reaching his RFC decision. Finally, he contends that the ALJ did not do a property function-by-function analysis. I will address in detail only some of these issues because I find them to be dispositive.[2]

"It is well-established that 'the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shows to the contrary.' A treating physician's report 'may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.'" *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155,1159 (11th Cir. 2004)(quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997), and *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)). In this case, the ALJ gave little weight to the opinion of Dr. Jeffrey Newfield, one of Gatley's treating physicians, finding that Gatley did not seek treatment from Dr. Newfield, but merely evidence in support of a worker's compensation claim, and that Dr. Newfield's functional capacity assessment was based on uncritical acceptance of Gatley's reports of his symptoms.

While the ALJ is correct that Gatley was initially referred to Drs. Newfield for assistance in evaluating his ability to continue to work for the Postal Service, review of the treatment records reflect that Gatley was also receiving treatment from Drs. Newfield. They prescribed medication, provided exercise and physical therapy recommendations, and closely monitored his condition long after he stopped working at the Postal Service.

While Dr. Jeffrey Newfield did not document in detail in each treatment note the physical examinations he performed to assess Gatley's condition, there is some record

---

[2] The parties were advised that issues not specifically raised would be waived. Doc. No. 7 at 2.

evidence that he did examine Gatley rather than just relying on Gatley's report of his condition.  In June, 2006, Dr. Newfield identified what felt "like ropiness of knots within the paraspinal musculature."  R. 468.

More importantly, there is other evidence in the record which was not mentioned by the ALJ that supports Dr. Newfield's findings about Gatley's limitations.   In July 2008, Sangeeta Duggal, M.D.,examined Gatley.  She determined that Gatley's muscle strength in the bilateral lower extremities was 4/5, and he had decreased sensation to light touch from his thigh through his toes on the right and from his knee to his foot on the left.  R. 426. She observed spasms, tenderness and pain with motion in the spine which was significant enough to be responsible for an abnormal gait.  R. 429, 431. Sensation in the lower extremities was 1 / 2. R. 430.  These findings are consistent with Dr. Newfield's medical source statements.

Additionally, the ALJ stated that he gave great weight to the opinion of the reviewing doctors.  Yet, he did not explain why he did not credit Dr. Morford's functional capacity assessment, which adopted many of the functional limitations identified by Dr. Newfield in his medical source statement, but which functional limitations were not included in the ALJ's RFC determination.

The failure to discuss all of the evidence of record, and the inconsistencies in the ALJ's analysis as discussed above, leave this Court with an insufficient basis to determine whether the conclusions "were rational and supported by substantial evidence."  *Winschel v. Comm'r Soc. Sec.*,631 F.3d 1176, 1179  (11th Cir. 2011).  Accordingly, remand for further proceedings is required.

On remand, the Commissioner should consider and discuss all of the evidence of record, including the VA disability determination.  He should assess the functional limitations arising from Gatley's condition, including nonexertional limitations arising from side effects of medication and mental health issues.  If nonexertional limitations are found, the better practice would be to again call upon the services of a VE to identify work Gatley could perform in light of his RFC.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner be **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with its final order and, thereafter, to close the file.

**DONE** and **ORDERED** this 15th day of March, 2011.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE